**NEW YORK STATE INSPECTION, SECURITY AND LAW ENFORCEMENT EMPLOYEES, DISTRICT COUNCIL 82, AFSCME, AFL–CIO, et al., Plaintiffs,**

v.

**The NEW YORK STATE PUBLIC EMPLOYMENT RELATIONS BOARD, et al., Defendants.**

**No. 81–CV–1165.**

United States District Court, N.D. New York.

Jan. 17, 1984.

See also, D.C., 629 F.Supp. 839.

Rowley Forrest and O'Donnell, Albany, N.Y., for plaintiffs; Richard R. Rowley, of counsel.

Robert Abrams, Atty. Gen. of N.Y., Albany, N.Y., for defendants; Allan S. Kaufman, Asst. Atty. Gen., of counsel.

## MEMORANDUM–DECISION AND ORDER

McCURN, District Judge.

Plaintiffs, the New York State Inspection, Security and Law Enforcement Employees, District Council 82 ("Council 82") and individual members of Council 82 commenced this action under 42 U.S.C. § 1983 to challenge, on First and Fourteenth Amendment grounds, the imposition of a penalty against Council 82 by the New York Public Employment Relations Board ("PERB"). The penalty, an 18 month suspension of dues check-off privileges, was imposed pursuant to New York's Taylor Law, NEW YORK CIVIL SERVICE LAW ("CSL") § 200 *et seq.*, upon PERB's determination that Council 82 had encouraged and condoned an unprovoked strike in the spring of 1979.

The defendants, represented by the Attorney General of the State of New York, have moved to dismiss the eight-count complaint for failure to state a claim upon which relief can be granted, Rule 12(b)(6), Fed.R.Civ.P. The motion is granted in part and denied in part, as hereinafter set forth.

## BACKGROUND

Accepting as true the material, non-conclusory allegations in the amended complaint, *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957); *Koch v. Yunich,* 533 F.2d 80, 85 (2d Cir.1976), the background of this lawsuit may be summarized as follows.[1]

Council 82 is the certified bargaining agent for New York State employees in the Security Services bargaining unit. Beginning in December of 1978, Council 82 bargained with the New York State Office of Employee Relations ("OER") over the terms of a new contract scheduled to expire on March 31, 1979. After an impasse was declared on March 20, 1979, PERB was notified and it assigned two members of its public Employment Conciliation section, Erwin Kelly and Benjamin Westervelt, to mediate the dispute.[2]

Several negotiating sessions were held, during which the two parties were usually located in separate rooms and communicated through the PERB mediators. At the close of one such session, which ran from April 4–5, the parties believed from the communications of Kelly and Westervelt that an oral argument had been reached.

---

1. Many of the allegations in the Amended Complaint are not summarized in the "Background" section of this opinion, but are instead summarized in the discussion of the particular claims to which those allegations relate.

2. N.Y. CSL § 205.5(i) authorizes PERB to establish panels "to serve as mediators, arbitrators, or members of factfinding boards." When bargaining parties reach an "impasse" within the meaning of N.Y. CSL § 209.1, PERB is required, *inter alia,* to appoint mediators "to assist the parties to effect a voluntary resolution of the dispute." *Id.* § 209.3(a).

Plaintiffs allege, however, that "after exhaustive efforts to reduce the same to writing ... the union realized on April 13, 1979, that no meeting of the minds had been achieved...." *Amended Complaint* ¶ 49. Since the State maintained the view that an agreement had already been reached and refused to bargain further, Council 82 demanded that PERB order the resumption of negotiations.

That demand was considered by the PERB Board, comprised of defendants Harold Newman, Ida Klaus, and David C. Randles. On April 16, after having conferred with the mediators and PERB attorneys, and after having also conferred with the OER director Meyer Frucher and his staff, but without having conferred with representatives of Council 82, the Board made what plaintiffs characterize as "the crucial decision": it decided that a complete agreement had been reached by Council 82 and the State, and that it would therefore not order the resumption of negotiations.

The following day, Council 82 filed an improper practice charge with PERB, alleging that the state was refusing to bargain in good faith.[3] Two days later, on April 19, the State filed a reciprocal charge with PERB, alleging that an agreement had previously been reached and initialed by the parties, but had been repudiated by Council 82.[4]

Also on April 19, Council 82 commenced an action in State Supreme Court, Albany County, and immediately moved by order to show cause to enjoin the State from imposing the terms of the alleged contract on the bargaining unit. The court granted plaintiffs' motion for a preliminary injunction upon finding that Council 82 "has a high probability of success on the merits in its action for a declaratory judgment that no final agreement was reached." *Amended Complaint* Appendix 3 at 5–6.

Meanwhile, beginning on April 18, "large numbers of bargaining unit employees absented themselves from work and continued to do so until approximately 8:00 a.m. on May 4, 1979." *Amended Complaint* ¶ 57.[5]

On May 29, PERB Counsel Martin Barr issued a strike charge against Council 82 pursuant to N.Y. CSL § 210.3(c), and amended that charge on June 6. The strike charge was ordered to be tried jointly with the two improper practice charges the parties had previously leveled against each other; the three charges were assigned to PERB Hearing Office Robert Miller for fact-finding and recommendation.

In a seventeen page decision rendered December 29, 1980, Hearing Officer Miller rejected Council 82's contention that an agreement had never been reached and that the strike was provoked. Instead, he found:

> In a meeting on April 4 which lasted until the early morning hours of April 5, agreement on all remaining issues was reached "in concept," a majority of the entire union negotiating team having voted its approval.... It was understood by each of the parties that all that remained was to draft the wording of agreement and submit it to the Union membership for ratification.

*Amended Complaint* Appendix 5 at 4.

Hearing Officer Miller further found that when the Union negotiators presented the agreement to the unit members the reaction was overwhelmingly negative, and that due to membership pressure, the nego-

---

**3.** A copy of the charge and the State's answer thereto are annexed to the Amended Complaint as Appendix 1 and 1A.

**4.** A copy of the charge and Council 82's answer thereto are annexed to the Amended Complaint as Appendix 2 and 2A.

**5.** In *Cheeseman v. Carey*, 623 F.2d 1387 (2d Cir.1980), a case arising out of the same events, Judge Friendly noted as follows:

> Some 6,500 members of the 11,000 member Unit were determined to have engaged in a work stoppage lasting 16 days in April and May 1979, which, as the district court found, had caused considerable disruption, particularly in prisons, and had required the mobilization of the National Guard.

This court, of course, will not consider the factual determination of the *Cheeseman* court in deciding the instant motion.

tiators repudiated the agreement on April 13, citing various pretexts. *Id.* Appendix 5 at 5–8.

After a discussion of Council 82's role in the ensuing strike, Hearing Officer Miller concluded as follows:

I find that the Union did not engage in, directly cause, or instigate the strike, but that it encouraged and condoned it in violation of § 210.1 of the Act, and that the primary causative factor for the strike was the Union's attempted evasion of its obligations to negotiate in good faith, as to which I find that the Union has violated § 209–a.2(b) of the Act.

*Id.* Appendix 5 at 17. The improper practice charge filed by Council 82 against the State was dismissed.

Council 82 appealed to the PERB Board, which rendered a decision on September 24, 1981, affirming the Hearing Officer's findings of fact and conclusions of law. The Board then considered an appropriate penalty to impose in light of the statutory criteria set forth in N.Y. CLS § 210.3(f), and ordered:

That the dues deduction and agency shop fee privileges, if any, of DC 82 be forfeited, commencing on the first practicable date and continuing thereafter for a period of 18 months. Thereafter no dues or agency shop fees shall be deducted on its behalf until it affirms that it no longer asserts the right to strike against any government, as required by the provisions of CSL § 210.3(g).

*Id.* Appendix 6 at 8–9.

One month later, this federal suit was commenced. The parties have stipulated to stay the suspension of dues check-off privileges until entry of a judgment by this court finally determining the action.

DISCUSSION

Before proceeding to analyze each of the eight claims for relief in the Amended Complaint, the court notes that dismissal under Rule 12(b)(6) is not warranted unless "it

appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson, supra,* 355 U.S. at 45–46, 78 S.Ct. at 101–02.

I

Plaintiffs' first claim is that "the manner in which PERB applied New York Civil Service Law Section 210 to Council 82 constitutes a deprivation of property without due process of law." *Amended Complaint* at 34. The gravamen of the claim is that PERB adjudicators were biased and prejudged the strike charge against Council 82. Allegations in support of the claim are scattered throughout the lengthy Amended Complaint. Summarized, plaintiffs allege that the PERB adjudicators were improperly influenced by (A) their personal familiarity with, and involvement in the events preceding the strike; (B) their need to adhere to a previous administrative determination; (C) their personal bitterness toward Council 82 and its members; and (D) *ex parte* communications during the course of the PERB proceedings. Plaintiffs also base their claim of prejudgment on (E) an allegation that remarks by PERB Chairman Newman revealed his prior determination of adjudicative facts.

"[D]ue process demands impartiality on the part of those who function in judicial or quasi-judicial capacities." *Schweiker v. McClure,* 456 U.S. 188, 195, 102 S.Ct. 1665, 1669, 72 L.Ed.2d 1 (1982); *Wolkenstein v. Reville,* 694 F.2d 35, 41 (2d Cir.1982). Accordingly, where it is shown that the decisionmaker was actually biased, or that the circumstances were such that the risk of bias is too great, the proceeding is "constitutionally unacceptable" and the decision must be overturned. *Withrow v. Larkin,* 421 U.S. 35, 47, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712 (1975).[6]

However, a bare allegation of bias or prejudgment does not suffice to state a claim that due process has been

---

**6.** The right to a hearing that is "conducted in an impartial manner" is also conferred by the N.Y. STATE ADMINISTRATIVE PROCEDURE ACT § 303. Plaintiffs have not, however, asserted any claim for relief under this or any other state statute.

violated. Notwithstanding the general principles of *Conley v. Gibson, supra,* the claim that a decisionmaker was prejudiced "is so easily made and can precipitate such protracted proceedings with such disruption of governmental functions," *Angola v. Civiletti,* 666 F.2d 1, 4 (2d Cir.1981), that the complaint must contain some specific factual allegations indicating bias or prejudgment, and not rely only upon conclusions. *United States v. Scaccia,* 514 F.Supp. 1353, 1355 (N.D.N.Y.1981) (Mac-Mahon, C.J.). *See, Koch v. Yunich,* 533 F.2d 80 (2d Cir.1976). In order to overcome the presumption that administrators who serve as adjudicators are unbiased, those allegations must reveal either actual prejudice or some disqualifying pecuniary or institutional interest. *Schweiker v. McClure, supra,* 456 U.S. at 195, 102 S.Ct. at 1669; *Wolkenstein v. Reville, supra,* 694 F.2d at 41.

■ Moreover, the court rejects at the outset plaintiffs' argument that allegations of bias always require the examination of a factual record and cannot be dismissed by mere reference to the complaint. Just as *Withrow* identified situations where the risk of bias is "constitutionally unacceptable," that case and others have conversely identified situations where the risk is deemed acceptable. Allegations of circumstances where the risk of bias is constitutionally acceptable do not state a claim for relief. *See e.g., O'Brien v. Bd. of Ed. of the City of New York,* 498 F.Supp. 1033 (S.D.N.Y.1980) (dismissing claim of inherent bias in Taylor law proceeding); *Tepper v. Galloway,* 481 F.Supp. 1211 (E.D.N.Y. 1979) (same); *Starrs v. Block,* Civ. No. 77–5435, 12 P.E.R.B. 7501 (S.D.N.Y.1978) (same).

### A.

In support of their contention that PERB adjudicators prejudged the case based on their familiarity with and involvement in the negotiations, plaintiffs allege, *inter alia,* that,

> [PERB Chairman] Newman was in almost daily communication with the mediators Kelly and Westervelt, his attorneys

Lefkowitz, Barr, Thier and Cagliostro, as well as the defendants Carey and Frucher or their representatives regarding the status of the negotiations, the actions of the parties and their legal rights and responsibilities to the end that he was fully informed of the version of the facts and law as perceived by [those persons], and the defendant Newman in turn communicated the substance of all of the foregoing to [PERB Board members] Klaus and Randles.

*Amended Complaint* ¶ 44. Similar allegations of communications among PERB personnel, and of communications between PERB adjudicators and the negotiating parties appear throughout the *Amended Complaint.* E.g., ¶¶ 22–24, 45, 46, 50, 55, 56, 71, 74, 75.

In plaintiffs' view, PERB's familiarity with and involvement in the negotiations makes this situation one "in which experience teaches that the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." *Withrow, supra,* 421 U.S. at 47, 95 S.Ct. at 1464. However, the *Withrow* decision itself, and the subsequent Supreme Court decision in *Hortonville Joint School District No. 1 v. Hortonville Education Ass'n,* 426 U.S. 482, 96 S.Ct. 2308, 49 L.Ed.2d 1 (1976) establish that such allegations do not support a claim of unconstitutional bias.

In *Withrow,* the Supreme Court considered whether a state medical examining board could constitutionally preside over a license suspension hearing on charges evolving from its own investigation. Plaintiffs argued that the combination of investigative and adjudicative functions necessarily created an unconstitutional risk of bias. The Court unanimously rejected that view, and held that,

> [t]he mere exposure to evidence presented in a nonadversary investigative procedure is insufficient in itself to impugn the fairness of the Board members at a later adversary hearing. Without a showing to the contrary, state administrators 'are assumed to be men of con-

science and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances.'

*Id.*, 421 U.S. at 55, 95 S.Ct. at 1468, *quoting United States v. Morgan*, 313 U.S. 409, 421, 61 S.Ct. 999, 1004, 85 L.Ed. 1429 (1941).

Similarly, in *Hortonville*, the Court held it constitutionally permissible for Board of Education officials, who had participated in pre-strike negotiations with teachers, to preside over a hearing for the purpose of determining whether teachers who have admitted engaging in an illegal strike should be dismissed. Citing *Withrow v. Larkin*, *supra*, the Court explained that "mere familiarity with the facts of a case gained by an agency in the performance of its statutory role does not, however, disqualify a decisionmaker," *Id.*, 426 U.S. at 493, 96 S.Ct. at 2314, and that "a showing that the Board was 'involved' in the events preceding this decision ... is not enough to overcome the presumption of honesty and integrity in policymakers with decisionmaking power." *Id.* at 497, 96 S.Ct. at 2316.

Plaintiffs argue that *Hortonville* is distinguishable on the ground that the teachers who appeared before the Board-administered hearing had *admitted* participating in an illegal strike, and that the Board was charged with making a policy-based decision, not an adjudicative decision. They maintain that in this case, the PERB Board was charged with the adjudicative function of determining whether an agreement had been reached in April of 1979, and whether Council 82 condoned the ensuing strike.

Although in this court's view the holding of *Withrow* would control in any event, it is also not persuaded that *Hortonville* is inapposite. First, PERB's function in this case was, to a large extent, exactly like that of the School Board in *Hortonville:* the PERB decisionmakers were required to weigh various policy factors and arrive at an appropriate penalty. See N.Y. CSL § 210.3(f).

Second, while it is true that the Supreme Court emphasized that the Hortonville

School Board's decision was not "adjudicative" in nature, a careful reading of the statement of facts in that opinion reveals that the School Board actually determined a factual question quite similar to the question before PERB:

On April 1, most of the striking teachers appeared before the Board with counsel.... An offer of proof was tendered to demonstrate that the strike had been provoked by the Board's failure to meet teachers' demands, and respondents' counsel asked to cross-examine Board members individually. The Board rejected the request, but permitted counsel to make the offer of proof, aimed at showing that the Board's contract offers were unsatisfactory, that the Board used coercive and illegal bargaining tactics, and that teachers in the district had been locked out by the Board.

*Id.*, 426 U.S. at 484–85, 96 S.Ct. at 2310. Thus the teachers in *Hortonville*, like Council 82, presented to the decisionmakers evidence that would either have absolved them of responsibility for the strike, or mitigated the penalty for participating therein.

Third, the more important factual determination that PERB had to make was whether Council 82 had condoned the strike, and this was *not* a matter with which PERB Board members had personal involvement. Indeed, it is evident from the Hearing Officer's decision, *Amended Complaint* Appendix 5, that the finding of condonation rested largely upon a news release issued by the union, expressing its support for the strike.

■ Finally, the court observes that in an important respect, the teachers in *Hortonville* presented a far stronger case for a finding of inherent bias than do the plaintiffs here. In *Hortonville*, the *same persons* who had sat opposite the teachers at the bargaining table later sat in judgment over the actions of their recent adversaries. In contrast, the PERB members who adjudicated and reviewed the strike charge had gained their familiarity with the issues only through their role as mediators, or through

their alleged contacts with those who had mediated or negotiated. Under such circumstances, the potential for inherent bias is not "consitutionally intolerable," and the allegations of prior familiarity and involvement do not state a claim for relief.

### B.

Plaintiffs next contend that PERB prejudged the strike charge against the Union because on April 16, 1979, it made "the crucial decision that a meeting of the minds had been reached," when it denied Council 82's demand to resume mediation or negotiations. Specifically, plaintiffs allege that the April 16 decision "constituted the final determination by PERB of the underlying issue in the proceeding later heard by Miller and decided by PERB, *Amended Complaint* ¶ 50, and that, at the conclusion of that subsequent proceeding,

> the defendants PERB, Newman, Klaus and Randles were compelled to deny Council 82's claim of extreme provocation, dismiss Council 82's improper practice charge in order to be consistent with their determination of April 16 since a contrary determination would necessarily hold that there was no meeting of the minds, no tentative agreement and that PERB had been in error on April 16 and was to at least some degree responsible for the work stoppage.

*Amended Complaint* ¶ 60.

Plaintiffs rely heavily on a trio of Supreme Court decisions, *Gagnon v. Scarpelli*, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973); *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); and *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). The collective holding of those cases, as described by the Supreme Court in *Withrow, supra,* is that "when review of an initial decision is mandated, the decisionmaker must be one other than the one who made the decision under review." *Withrow*, 421 U.S. at 58 n. 25, 95 S.Ct. at 1470 n. 25.

■ The case now before this court, like *Withrow*, is not within the scope of that principle. As plaintiffs concede, the PERB Board did not review, in an appellate sense, its own prior decision. Instead, it decided questions that were, in part, identical to questions it had previously decided in a different capacity. *Withrow* makes clear that this distinction is a fundamental and not a technical one; while the danger of prejudgment may be constitutionally intolerable in the first situation, it is not in the second. Quoting its prior decision in *FTC v. Cement Institute*, 333 U.S. 683, 702–03, 68 S.Ct. 793, 804, 92 L.Ed. 1010 (1948) the *Withrow* court stated:

> No decision of this Court would require us to hold that it would be a violation of procedural due process for a judge to sit in a case after he had expressed an opinion as to whether certain types of conduct were prohibited by law. In fact, *judges frequently try the same case more than once and decide identical issues each time, although these issues involve questions both of law and fact.* Certainly the Federal Trade Commission cannot possibly be under stronger constitutional compulsions in this respect than a court. (emphasis added).

The Court then noted a variety of other circumstances, arguably more prejudicial than the circumstances here, where the risk was found constitutionally acceptable:

> Judges repeatedly issue arrest warrants on the basis that there is probable cause to believe that a crime has been committed and that the person named in the warrant has committed it. Judges also preside at preliminary hearings where they must decide whether the evidence is sufficient to hold a defendant for trial. Neither of these pretrial involvements has been thought to raise any constitutional barrier against a judge's presiding over the criminal trial and, if the trial is without a jury, against making the necessary determination of guilt or innocence. Nor has it been thought that a judge is disqualified from presiding over injunction proceedings because he has initially assessed the facts in issuing or denying a preliminary injunction. . . . We should also remember that it is not contrary to

due process to allow judges and administrators who have had their initial decisions reversed on appeal to confront and decide the same questions a second time around (citations omitted).

*Id.* 421 U.S. at 56–57, 95 S.Ct. at 1469.

Finally, it must again be emphasized that the PERB defendants were, from the beginning, presumptively neutral participants in the events. The purportedly disqualifying "interest" they acquired, according to the plaintiffs, was the desire to vindicate their prior decision. This court cannot but conclude that such an interest is far less disabling than the alleged interest which was found constitutionally acceptable in *Wolkenstein v. Reville, supra, O'Brien v. Bd. of Ed. of the City of New York, supra, Tepper v. Galloway, supra,* and *Starrs v. Block, supra.* In each of these due process challenges to the imposition of Taylor Law penalties, the decisionmaker was not a neutral non-party like PERB, but was the "chief executive officer" of the governmental unit which suffered the alleged strike. *See* N.Y. CSL § 210.2(d), (h). Nonetheless, the courts in each case found nothing inherently unconstitutional in that scheme. Most recently, in *Wolkenstein,* the Court of Appeals affirmed summary judgment for the defendants, explaining:

> Fairly read, neither the facts stipulated to below nor the generalized assertions made here about (the chief executive officer's) responsibilities, prove an interest on his part in the outcome of the determinations made under § 210.2(h) sufficient, under the Supreme Court's standards, to oversome the "presumption of honesty and integrity," *Withrow v. Larkin, supra,* 421 U.S. at 47, 95 S.Ct. at 1464, that attaches by virtue of his office. Even if the "rigid requirements" of *Tumey* [*v. Ohio,* 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927)] and *Ward* [*v. Village of Monroeville,* 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972)] were thought applicable to administrative employment in the public employment context, a question as we noted previously, expressly

left open in *Hortonville, supra,* 425 U.S. at 491, 96 S.Ct. at 2313, plaintiffs have simply failed to show that [the officer's] situation is "one which would offer a possible temptation to the average man as a judge", *Tumey, supra,* 273 U.S. at 532, 47 S.Ct. at 444 [parallel citations omitted], to deny hearings to teachers whose objections were legally sufficient.

*Id.* 694 F.2d at 42. This court is of course aware that the claim here differs from the claims made in *Wolkenstein et al,* but that is precisely the point: the purportedly disqualifying "interest" alleged here is, in the court's view, far less able to impair the presumptive "honesty and integrity" of a decisionmaker than the adversarial interest inherent in N.Y. CSL § 210.2(h) proceedings which, in this Circuit, is deemed constitutionally tolerable.

■ Therefore, while the court accepts as true plaintiffs allegations that the defendants reviewed, in an adjudicative capacity, the same issues they had decided in a non-adjudicative capacity, such allegations do not support the claim that they have been denied due process of law.

### C.

Plaintiffs also maintain that the PERB Board members could not have been impartial because, during the strike, members and representatives of Council 82 made "numerous highly offensive public statements" regarding them. Newman, Klaus and Randles were accused of lying, of not being neutral, of being incompetent, immoral, unethical, and degenerate. *Amended Complaint* ¶ 58.

Unlike the previous contentions of bias that the court has rejected, *supra,* the contention here is not one of "inherent bias," i.e., bias arising out of the structure of the administrative decisionmaking process. Instead the contention is that particular incidents that occurred during this strike could be found to have embittered these adjudicators.[7]

---

**7.** In his *Administrative Law Treatise,* Professor

Davis refers to this type of bias as "personal

Under a "realistic appraisal of psychological tendencies and human weakness," *Withrow, supra,* 421 U.S. at 47, 95 S.Ct. at 1464, plaintiffs' contention has sufficient merit to withstand a motion to dismiss. Indeed, in discussing circumstances where "the probability of actual bias on the part of the judge is too high to be constitutionally tolerable," the *Withrow* Court gave as an illustration the situation where the adjudicator "has been the target of personal abuse or criticism from the party before him." *Id.* at 47, 95 S.Ct. at 1464, citing *Taylor v. Hayes,* 418 U.S. 488, 501–03, 94 S.Ct. 2697, 2704–05, 41 L.Ed.2d 897 (1974); *Mayberry v. Pennsylvania,* 400 U.S. 455, 91 S.Ct. 499, 27 L.Ed.2d 532 (1971); *Pickering v. Bd. of Ed.,* 391 U.S. 563, 578–79, n. 2, 88 S.Ct. 1731, 1739–40, n. 2, 20 L.Ed.2d 811 (1968).

■ Of course, due process is offended only when abusive acts have rendered the decisionmaker unable to decide a matter with impartiality. Therefore, to establish their claim, plaintiffs will need to prove not merely that *they* were provocative, but that the decisionmaker was provoked. See *Hortonville, supra,* 425 U.S. at 491–92, 96 S.Ct. at 2313–14; *United States v. Wolfson,* 558 F.2d 59, 62 (2d Cir.1977).[8] Never-

theless, since this court cannot, from the complaint alone, conclude that "the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," *Conley v. Gibson, supra,* the claim of personal bias cannot be dismissed insofar as it rests upon allegations that the PERB Board members were provoked by abuse from members of Council 82.[9]

### D.

■ The Amended Complaint also contains at least one allegation of an impermissible *ex parte* contact that occurred during the decisionmaking process. In ¶ 80, plaintiffs allege that, while the Hearing Officer's decision was under review, PERB Board members "discussed the merits of the case and its decision with and in the presence of Jerome Lefkowitz and Martin Barr."[10]

The allegation is sufficient in and of itself to support a due process claim. As the Court of Claims stated in *Camero v. United States,* 375 F.2d 777, 780 (1967) with respect to an administrative adjudication, "[O]ne of the fundamental premises inherent in the concept of an adversary hearing, particularly if it is of the evidentiary type, is that neither adversary be permitted to

bias", because it involves an attitude toward *persons,* and not an attitude about issues of fact, law, policy or discretion. *Id.* § 19.5 at 389 (1980 ed.).

**8.** In *Hortonville,* the Supreme Court had the benefit of a factual record before it, enabling it to deal with the problem in this manner:

[Respondents argue] that the Board has manifested some personal bitterness toward the teachers, aroused by teacher criticism of the Board during the strike.... [t]here is nothing in the record to support charges of personal animosity.

*Id.* 426 U.S. at 491–92, 96 S.Ct. at 2313–14. In *United States v. Wolfson,* 558 F.2d 59 (2d Cir.1977), the appellant, who had previously been convicted of stock fraud in a trial before District Judge Palmieri, argued that Judge Palmieri should have recused himself from a subsequent *coram nobis* proceeding because of the acrimonious nature of their relationship during the trial. The Court of Appeals found evidence in the record that the appellant had verbally abused the judge, but concluded that such evidence "only establish[es] Wolfson's feelings to-

ward Judge Palmieri, not the reverse." *Id.* at 62.

**9.** It is troubling to sustain a claim of bias that is founded upon the plaintiffs' own provocative conduct, but in this regard we note the following observation:

While it would disserve efficient judicial administration to permit a party to force disqualification of the trier of fact by his own outrageous conduct, recent cases suggest a disposition to put direct punishment for that misconduct in other hands. *Mayberry v. Pennsylvania,* 400 U.S. 455 [91 S.Ct. 499, 27 L.Ed.2d 532] (1971); *Taylor v. Hayes,* 418 U.S. 488 [94 S.Ct. 2697, 41 L.Ed.2d 897] (1974). W. Gellhorn, C. Byse, P. Strauss, *Administrative Law Cases and Comments* 766 n. 3. (1979 ed).

**10.** Although Barr only instituted the strike charge, and did not actually prosecute the charge at the hearing, his role in instituting the charge may, depending on the evidence, make him an adversary in the proceeding, precluding him from communicating with the decisionmakers *ex parte.*

engage in *ex parte* communication concerning the merits of the case with those responsible for the decision." *Cf. Koster v. United States*, 685 F.2d 407, 412, 231 Ct.Cl. 301 (1982); Canon 17, ABA Canons of Judicial Ethics. Again, this court cannot, on this motion, conclude that plaintiff will be unable to prove that the alleged *ex parte* contract occurred, or that it amounted to an impairment of plaintiffs' due process rights. Plaintiffs are therefore entitled to proceed with their claim based on the allegation in ¶ 80.[11]

### E.

In ¶ 56 of their Amended Complaint, plaintiffs allege that during the strike, PERB Chairman Newman made a public statement expressing the view that this was a situation in which the parties had reached an agreement but the union was on strike. In plaintiffs' view, this statement is the "smoking gun" that proves the Board prejudged the two issues it later considered in an adjudicatory capacity: whether there had been an agreement, and whether the union condoned the strike. In defendants' view, if the statement was made at all, it is not a sufficient indication of prejudgment to overcome the presumption of impartiality.

 Due process is not offended when a decisionmaker has simply "taken a position, even in public, on a policy issue related to the dispute." *Hortonville, supra*, 426 U.S. at 493, 96 S.Ct. at 2314. However, it is constitutionally unacceptable for a decisionmaker to announce in advance his position on adjudicative facts. *Cinderella Career and Finishing Schools, Inc. v. FTC*, 425 F.2d 583, 591 (D.C.Cir.1970); *See also*, Davis, *Administrative Law Treatise*, § 19.4 at 382 (1980 ed.). The allegation here, if true, could support a finding of actual prejudgment, or a sufficient appearance of prejudgment, of adjudicative facts to implicate the plaintiffs' due process rights. It therefore states a claim upon which relief may be granted.[12]

To summarize the court's analysis of the first claim in the *Amended Complaint*, the plaintiffs' allegations of inherent bias (bias arising out of PERB members' familiarity with and involvement in the strike and their "interest" in adhering to a previous administrative decision) do not state a claim of deprivation of property without due process; but plaintiffs' allegations of non-inherent circumstances indicating actual bias (abuse directed toward the decisionmakers, *ex parte* contacts, and defendant Newman's public remarks) do state such a claim.

### II

Plaintiffs' second claim is that "the hearing procedure of New York Civil Service Law Section 210(3)(c) and its application by PERB constitutes a deprivation of property without due process of law." *Amended Complaint* ¶ 108. That section provides:

In the event that it appears that a violation of subdivision one of this section

---

11. Plaintiffs also allege in Amended Complaint ¶ 37 that "PERB hearing officers and trial examiners and the said Miller when he is acting in that capacity report orally to the defendant PERB." Although the court recognizes that it must construe the allegations liberally, to discern an unconstitutional *ex parte* contact from this vague allegation requires, in the court's view, a step beyond construction in to the realm of imagination. Paragraph 37, therefore, does not support a claim for relief.

12. Plaintiffs actually offered the allegation of defendant Newman's remarks as an example of "the extent and nature of the information known to the defendants" and their prejudgment of the issues based on such knowledge. *Amended Complaint* ¶ 56. Thus plaintiffs view the allegation not as an independant ground for a claim of actual bias, but as evidence of unconstitutional inherent bias.

The court views the legal implications of defendant Newman's remarks quite differently. Although Newman's remarks may be indicative of prejudgment, and therefore support a claim, they do not lend weight to any particular theory of inherent bias advanced by the plaintiffs. Moreover, it is appropriate to note here that the court's recognition that allegations as to defendant Newman's remarks state a claim should be no means be viewed as a prejudgment of the issues relating to discovery and admissibility of evidence that are peculiar to claims of this nature.

may have occurred, the chief legal officer of the government involved, or the board on its own motion, shall forthwith institute proceedings before the board to determine whether such employee organization has violated the provisions of subdivision one of this section.[13]

In this instance, the proceeding was instituted "by the board on its own motion." See *Amended Complaint* ¶ 62; *id.*, Exhibit 4.

### A.

Turning first to their facial challenge, plaintiffs contend that CSL § 210.3(c) does not comport with the due process clause because it has no built-in safeguards to prevent the improper admixture of prosecutorial and adjudicative functions when proceedings are instituted by the board on its own motion. Relying on several cases wherein courts have imposed upon administrative tribunals standards akin to those set forth in the Canon of Judicial Ethics, *e.g.*, *Commonwealth Coatings Corp. v. Continental Casualty Co.*, 393 U.S. 145, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968); *McClure v. Harris*, 503 F.Supp. 409 (N.D. Cal.1980), plaintiffs argue that CSL § 210.-3(c) must contain similar standards, identifying situations where the danger of undue influence or conflict of interest among adjudicators is too high to be permissible.

Plaintiffs fail to establish a claim that CSL § 210.3(c) is unconstitutional on its face. The statute simply provides for a combination of prosecutorial and adjudicative functions in one agency, which does not in itself offend the due process clause. *See Marcello v. Bonds*, 349 U.S. 302, 75 S.Ct. 757, 99 L.Ed. 1107 (1955) (due process is not violated by a deportation procedure which permits the supervision of adjudicating officers by officials charged with investigating and prosecutorial functions); *American Telephone and Telegraph Co. v. F.C.C.*, 449 F.2d 439, 455 (2d Cir.1971) (observing that "[T]he case law generally rejects the proposition that the combination of judicial and adversary functions in one agency is a denial of due process."); Davis, *Administrative Law Treatise, supra*, 18:1–2.[14] More specifically in a prior due process challenge to the combination of functions in CSL § 210.3(c), a state court disposed of the claim with this brief observation:

> The combination of investigatory, prosecutory and quasi-judicial functions in a single administrative agency has been authorized by many statutes such as the Labor Law, Alcoholic Beverage Control Law, Vehicle and Traffic Law, and Insurance Law, and is not considered a denial of due process.

*Buffalo Teachers' Federation, Inc. v. Helsby*, 35 A.D.2d 318, 322, 316 N.Y.S.2d 125 (3d Dept.1970), *app. dsmd.*, 29 N.Y.2d 649, 324 N.Y.S.2d 1033, 273 N.E.2d 321 (1971). Clearly, then, § CSL § 210.3(c) is amenable to constitutional application and construction.

To be sure, a court may determine "from the special circumstances present in the case before it that the risk of unfairness is intolerably high," *Withrow v. Larkin, supra*, 421 U.S. at 58, 95 S.Ct. at 1470, and in the next subpart of this decision, the court will treat the question of whether the combination of functions, *as applied in this*

---

**13.** "[S]ubdivision one of this section" declares that "No public employee or employee organization shall engage in a strike, and no public employee or employee organization shall cause, instigate, encourage, or condone a strike." N.Y. CSL § 210.1.

**14.** Plaintiffs argue that the holding of *Marcello v. Bonds* is limited to the context of a deportation hearing. However, as the Court of Appeals for the District of Columbia has observed, *Marcello* "has consistently been interpreted to stand for the proposition that the combination in ad-

ministrative procedures of judging with prosecuting is not, *per se*, a denial of due process." *Jonal Corp. v. District of Columbia*, 533 F.2d 1192, 1196 (D.C.Cir.1976).

Plaintiffs' contrary reliance upon *Wong Yang Sung v. McGrath*, 339 U.S. 33, 70 S.Ct. 445, 94 L.Ed. 616 (1950) is misplaced. That decision, forbidding a combination of prosecutorial and adjudicative functions, rested on an interpretation of the Administrative Act, not the due process clause.

*instance,* falls short of the minimal standards required by due process.

The plaintiffs have failed, however, to produce any authority for the proposition that the due process clause requires the Civil Service Law itself to identify those "special circumstances" where PERB officials may not adjudicate a proceeding instituted "by the board on its own motion." On the contrary, the plain import of *Withrow v. Larkin* as well as the cases cited by plaintiffs, *e.g., Commonwealth Coat Corp.* and *McClure v. Harris, supra,* is that the identification of circumstances where the combination of functions would amount to a due process violation is, generally, a task for the courts.[15]

Of course, the legislature *may* prescribe standards relating to the separations of functions, which may mirror the standards required by the due process clause, or may be more stringent. New York State has, for instance, adopted a State Administrative Procedure Act which is applicable to the instant proceedings and which, *inter alia,* strictly prohibits administrative adjudicator from obtaining "aid or advice" from agency staff members who are engaged "in the investigative or prosecuting functions in connection with the case under consideration or factually related case." N.Y. SAPA § 307.2(b). *See also* Administrative Procedure Act at 5 U.S.C. § 554(d); National Labor Relations Act, at 29 U.S.C. § 153.[16] But in the absence of a particular statutory standard limiting the circumstances in which the board may institute proceedings on its own motion, or in which PERB prosecutors may appear before PERB adjudicators, the court will determine from the circumstances before it whether the right to due process has been observed.

## B.

As stated above, the facial validity of CSL § 210.3(c) does not disable plaintiffs from contending that, as applied in this instance, the combination of prosecutorial and adjudicative functions in PERB violated Council 82's due process rights. Plaintiffs argue that the statute was applied unconstitutionally because (1) the PERB officials who prosecuted the strike charge had previously practiced law with the PERB Hearing Officer who adjudicated the charge; and (2) the PERB officials who prosecuted the strike charge also represented the PERB Board members who reviewed the decision of the Hearing Officer.

More particularly, plaintiffs allege in ¶ 32 of their Amended Complaint:

Upon information and belief, for more than seven years, commencing no later than the spring of 1969 until at least December of 1976, the exact period of which is unknown to plaintiffs, the aforesaid Lefkowitz, Barr, Thier and Miller practiced law together, and their sole clients were the defendants PERB, its members of the Board and its employees and members of the panel of mediators, arbitrators and fact-finders maintained by PERB....

Plaintiffs further allege that Lefkowitz, Barr, Thier, Miller and Cagliostro (who joined in 1975) "zealously performed in all respects as attorneys for Newman, Randles and Klaus ...", and "preserved the confidences and secrets" of those clients. *Id.* at ¶ 34. As attorneys in the Office of PERB Counsel, Lefkowitz et al. allegedly would draft "opinions on legal questions and legal interpretations" for PERB Board members;

---

**15.** The court has located one decision invalidating an administrative order because of the failure of the agency to prescribe standards for the separation of prosecutorial and adjudicative functions. *Columbia Research Corp. v. Schaffer,* 256 F.2d 677 (2d Cir.1958), *judgment withdrawn as moot, id.,* 256 F.2d at 680. However, the requirement of express guidelines was inferred from the Administrative Procedure Act, not from the due process clause.

**16.** In his Treatise on Administrative Law, Professor Davis observed that, as Congress went to one "extreme" in separating agency functions in the National Labor Relations Act, the Supreme Court "went to the opposite extreme" in tolerating combinations of functions as a matter of due process in *Marcello v. Bonds, supra,* and *Shaughnessy v. United States ex rel. Accardi,* 349 U.S. 280, 75 S.Ct. 746, 99 L.Ed. 1074 (1955). *Id.* § 18.1 at 342.

48

discuss and draft "decisions of cases pending before PERB"; provide legal advice and assistance to the staff, and represent PERB, Newman, Klaus and Randles in the prosecution and defense of court litigation and administrative proceedings. *Id.* at ¶ 35.

Initially, the court must determine what standard to apply in evaluating the constitutionality of the defendants' actions. Council 82 urges the court to apply to PERB adjudicators the standards set forth in Cannon 3C of the Code of Judicial Conduct, which provides in pertinent part:

C. Disqualification.

(1) A judge should disqualify himself in a proceeding in which his impartiality might reasonably be questions, including but not limited to instances where:

(a) he has a personal bias or prejudice concerning a party...

(b) he served as a lawyer in the matter in controversy, or a lawyer with whom he previously practiced law served during such association as a lawyer concerning the matter, or the judge or such lawyer has been a material witness concerning it.

These standards parallel the statutory disqualification standards that govern the federal judiciary. 28 U.S.C. § 455 (1976). *See Potashnick v. Port City Constru. Co.,* 609 F.2d 1101 (5th Cir.1980). In plaintiffs' view, Canon 3C and § 455, and the case law construing those sources, would require the PERB hearing officer to disqualify himself from hearing a matter prosecuted by his former law partners, and would require the PERB Board to disqualify itself from hearing a matter prosecuted by its attorneys.

· Plaintiffs produce a number of decisions in which the Code of Judicial Conduct, or principles akin to those in the Code, have been applied by courts reviewing administrative adjudications. *E.g. Commonwealth Coatings Corp. v. Continental Casualty Co., supra,* 393 U.S. 145, 89 S.Ct. 337, 21

L.Ed.2d 301; *Duffield v. Charleston Area Medical Center,* 503 F.2d 512 (4th Cir. 1974); *McClure v. Harris, supra* 503 F.Supp. 409. Indeed, *McClure* went as far as to hold that the application to administrative adjudicators of standards more lax than those applicable to the judiciary was constitutionally unacceptable. *Id.* at 415.

*McClure,* however, was recently reversed by the United States Supreme Court, *sub nom Schweiker v. McClure, supra,* 456 U.S. 188, 102 S.Ct. 1665, 72 L.Ed.2d 1 (1982). Although, in reversing, the Court did not expressly hold that Canon 3C is inapplicable to administrative adjudications, but rather found that the "District Court's analogy to judicial canons ... is not apt," *id.* at 197, n. 11, 102 S.Ct. at 1671 n. 11, it nevertheless carefully avoided approving the constitutionalization of Canon 3C. This court, therefore, declines to rush in where the Supreme Court fears to tread and pronounce that the due process clause requires the application, to administrative adjudications, of Canon 3C or 28 U.S.C. § 455(a) along with the body of caselaw construing those sources.

■ Instead of transplanting standards from the judicial to the administrative context, the court finds that it must evaluate the procedures allegedly employed by the defendants against a more flexible touchstone derived from *Withrow* and its progeny: whether "under a realistic appraisal of psychological tendencies and human weaknesses," the circumstances alleged here impose enough of a risk of bias or prejudgment on the part of the adjudicator, or unfair advantage on the part of one party, "that the practice must be forbidden if the guarantee of due process is to be adequately implemented." *Id.,* 421 U.S. at 47, 95 S.Ct. at 1464. In the court's view, the circumstances alleged by the plaintiff do not pose a sufficient risk to the fairness of the proceeding to offend due process, and therefore do not state a claim upon which relief can be granted.[17]

17. In support of their contention that PERB adjudicators were required to disqualify themselves, plaintiffs produce four purportedly analogous cases in which disqualification was

■ Turning first to the allegation that Hearing Officer Miller had previously practiced law with PERB prosecutors Barr, Their and Cagliostro, the risk of unfairness is slight indeed. Administrative adjudicators are presumed able to transcend the personal feelings they may have toward former colleagues, and to avoid unduly favoring (or disfavoring) the causes they advocate. Indeed, a prior professional association, without more, does not even offend the more stringent standards of The Code of Judicial Conduct or 28 U.S.C. § 455. Each of these sources would require a judge to disqualify himself from cases in which a "lawyer with whom he previously practiced law served *during such association as a lawyer concerning the matter.*" Canon 3C(1)(b); 28 U.S.C. § 455(b) (emphasis added). There is no allegation in the *Amended Complaint* that PERB prosecutors Thier, Barr or Cagliostro served during their association with Miller as prosecutors in this matter. In sum, the allegation concerning the relationship between Miller and PERB prosecutors does not support a due process claim.

The allegation that PERB Board members Newman, Klaus and Randles were, for several years, represented by the PERB officials who prosecuted the strike charge presents, in the court's view, a somewhat more tangible danger. The danger however does not lie in the likelihood of pre-judgment or bias on the part of the adjudicator; this is not a circumstance in which, "given a realistic appraisal of psychological tendencies and human weaknesses," a presumptively scrupulous adjudicator will lose his impartiality. Indeed, the allegation that administrative adjudicators were biased because administrative legal staff members appeared in the action is no more than a re-phrased challenge to the combination of functions in an agency. As discussed in Part II-A, *supra*, such allegations, without more, fail to state a claim.

Rather, the danger, in the court's view, lies in the potential for undue advantage one party may have due to its familiarity with the adjudicator. In plaintiffs' view, those advantages are analogous to the advantages enjoyed by a judge's law clerk, which were the focus of *Fredonia Broadcasting Co., Inc. v. RCA Corp.,* 569 F.2d 251 (5th Cir.1978). As the Court of Appeals observed, a judge's law clerk is "obviously privy to his judge's thoughts in a way the parties cannot be." *Id.* at 256. The same may well be said about an administrative adjudicator's legal advisor.

Nevertheless, it is significant that in *Fredonia* the Court of Appeals only held that a judge may not hear a case brought by a lawyer who had been a law clerk for the judge *during an earlier trial of the same case,* and it expressly declined to hold "that a former law clerk may never practice before the judge for whom he clerked." *Id.* at 256.

■ Although *Fredonia* was decided not by due process standards, but by a construction and application of 28 U.S.C. § 455, it nevertheless is instructive as to the nature of the danger presented when an adjudicator hears argument by his legal advisor. While in every such case some advantage will inure to the benefit of the attorney who is familiar with the judge's thought processes, that advantage only becomes constitutionally intolerable when the attorney is familiar with the judge's thought processes *about the very case the attorney is appearing in* before the judge.

There are, in the *Amended Complaint,* an allegation that PERB prosecutors en-

---

found proper under 28 U.S.C. § 455. *Potasnick v. Port City Const. Co.,* 609 F.2d 1101 (5th Cir. 1980); *Fredonia Broadcasting Corp., Inc. v. RCA Corp.,* 569 F.2d 251 (5th Cir.1978); *Texaco, Inc. v. Chandler,* 354 F.2d 655 (10th Cir.1965); and *Smith v. Sikorsky Aircraft,* 420 F.Supp. 661 (C.D. Cal.1976).

Although each of these cases can be distinguished on its facts from the circumstances herein, it is enough to observe that each was decided purely as a matter of statutory—and not constitutional—construction, with emphasis on the precise language of § 455 and the congressional purpose in enacting that provision. Inasmuch as this court declines plaintiffs' invitation to incorporate § 455 into the due process clause, the cases are inapposite.

gaged in an impermissible *ex parte* contact with PERB adjudicators during the pendency of this action, and this court held in Part I–D, *supra*, that such allegations state a claim under the due process clause.

▉▉▉ But except for the allegations with respect to an *ex parte* contact, there are no concrete allegations that any PERB prosecutor provided legal advice or performed other legal services for the PERB Board members with respect to the strike charge lodged against Council 82. In so stating, the court acknowledges that such an allegation could conceivably be extrapolated from the convoluted language in paragraph 35, which states:

> Upon information and belief, the said Lefkowitz, Barr, Thier, Cagliostro and Miller during the periods mentioned above in their practice of law as attorneys for PERB commonly and regularly are required to and in fact do perform during and in connection with thie [sic] matters herein alleged perform the following functions: .... [Twelve such functions are set forth].

Notwithstanding the principle of *Conley v. Gibson, supra*, requiring this court to construe the complaint in favor of the plaintiff and draw all reasonable inferences therefrom, this court concludes that the vague and conclusory language of paragraph 35 does not reasonably support an inference that PERB prosecutors counseled PERB Board members with respect to the pending adjudication.

Because plaintiffs have failed to allege anything more than a permissible combination of functions and a constitutionally tolerable measure of advantage enjoyed by PERB prosecutors as a result of their familiarity with the adjudicators, plaintiffs' second cause of action fails to state a claim upon which relief can be granted.

### III.

For their Third Claim for Relief, plaintiffs' contend that "New York Civil Service Law Section 205(4)(b), PERB's policy thereunder and its application herein to Council 82 constitutes a deprivation of property without due process of law." *Amended Complaint* ¶ 109. N.Y. CSL § 205.4(b) provides:

> § 205. Public Employment Relations Board
> (4) ...
> (b) No member of the board or its appointees pursuant to this subdivision, including without limitation any mediator or fact-finder employed or retained by the board, shall, except as required by this article, be compelled to nor shall he voluntarily disclose to any administrative or judicial tribunal or at the legislative hearing, held pursuant to subparagraph (iii) of paragraph (e) of subdivision three of section two hundred nine, any information relating to the resolution of a particular dispute in the course of collective negotiations acquired in the court of his official activities under this title, nor shall any reports, minutes, written communications, or other documents pertaining to such information and acquired in the course of his official activities under this article be subject to subpoena or voluntarily disclosed; ....

During the hearing on the strike charge and unfair practice charges, Hearing Officer Miller invoked PERB policy under this section and did not allow Council 82's attorneys to interrogate PERB mediators and other witnesses about:

> numerous conversations and telephone calls between the mediators, the defendant Newman and representatives of both parties and between the mediators and the defendant Newman, internal PERB communications, relative to information conveyed by Kelly to Newman and Newman's involvement in the negotiations, work stoppage and PERB decisions and actions therein.

*Amended Complaint* ¶ 72. According to plaintiffs, this line of questioning would have been relevant to the issues of (1) whether or not there had been a meeting of minds on April 5, 1979, which would bear on the improper practice charge and Council 82's defense of extreme provocation;

and (2) whether, as Council 82 maintained during the hearing itself, that PERB Board members had, through their familiarity, prejudged the strike charge against the union.

It should be noted at the outset that plaintiffs do not purport to state a claim that the Hearing Officer misapplied or violated CSL § 205.4(b). Their claim wholly consists of a due process challenge to the face and application of the statute.

As the Supreme Court stated in *Trammel v. United States*, 445 U.S. 40, 50, 100 S.Ct. 906, 912, 63 L.Ed.2d 186 (1980), "[t]estimonial exclusionary rules and privileges contravene the fundamental principle that 'the public ... has a right to every man's evidence.'" *Quoting United States v. Nixon*, 418 U.S. 683, 710, 94 S.Ct. 3090, 3108, 41 L.Ed.2d 1039 (1974).

Yet, while all such rules and privileges are "in derogation of the search for truth," *United States v. Nixon, supra* 418 U.S. at 710, 94 S.Ct. at 3108, it has nevertheless long been accepted that certain privileges are necessary to serve a greater public interest, such as the interest in preserving the confidentiality of socially desirable relationships which could be impaired without such assurance of confidentiality. The rules of evidence of New York protect several such relationships. *E.g.:* husband and wife (N.Y. CPLR § 4502); attorney and client (N.Y. CPLR § 4503); doctor and patient (N.Y. CPLR § 4504), clergyman and penitent (N.Y. CPLR § 4505).

The testimonial exclusion statute challenged herein, N.Y. CSL § 205(4)(b), like the other statutory privileges cited above, is clearly intended to protect, through assurances of confidentiality, the relationship between PERB Board members, mediators, and factfinders on one hand, and the public employers and employees on the other hand. In creating this privilege, the state legislature apparently reasoned that, absent such statute, the ability of PERB members to assist in the resolution of labor disputes in the public sector would be undermined by their entanglement in often-acrimonious legal battles between the parties.

■ Insofar as the plaintiffs challenge the constitutionality of N.Y. CSL § 205(4)(b) on substantive due process grounds, their claim is plainly untenable: the privilege is rationally—indeed, closely—related to a legitimate public purpose. *See Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 124–25, 98 S.Ct. 2207, 2213, 57 L.Ed.2d 91 (1978); *Gargiul v. Tompkins*, 704 F.2d 661, 668 (2d Cir.1983).

Plaintiffs' primary theory, however, is that they were deprived of procedural due process rights because the invocation of the privilege deprived them of a full and meaningful opportunity to be heard, and to present evidence rebutting the charge against them. In support, they invoke the oft-cited ultimatum of Judge Learned Hand, that "[t]he government must choose; either it must leave the transactions in the obscurity from which a trial will draw them, or it must expose them fully." *United States v. Andolscheck*, 142 F.2d 503, 506 (2d Cir.1944). More specifically, plaintiffs contend, on the authority of *Independent Productions Corp. v. Loew's, Inc.*, 22 F.R.D. 266, 277 (S.D.N.Y.1958), that when the government commences a lawsuit, even a civil lawsuit, it automatically waives all privileges.

An argument of this nature was recently rejected by the Court of Appeals for the District of Columbia Circuit. In *Attorney General of U.S. v. Irish People, Inc.*, 684 F.2d 928 (D.C.Cir.1982), the government sought to compel the defendant organization to register under the Foreign Agents Registration Act; the defendant sought to prove that it was the target of selective prosecution. Because of the government's invocation of the "state secret" privilege with respect to certain documents, the district court dismissed the case against Irish People, Inc., on the authority of *United States v. Andolscheck, supra*, and *United States v. Reynolds*, 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953). In reversing that dismissal, the Court of Appeals squarely rejected the notion that privileges are auto-

matically waived in a civil suit brought by the government. As the Court noted,

> Judge Hand himself carefully limited *Andolscheck* to 'cases *involv[ing] the prosecution of a crime* consisting of the very matters recorded in the express document, or of matters nearly enough akin, to make relevant the matters recorded.'

*Irish People, Inc., supra* at 950 (emphasis added), *quoting Andolscheck, supra* at 506. It further noted that in *United States v. Reynolds,* the Supreme Court made the same distinction, referring to *Andolscheck* as among "those cases in the criminal field, where it has been held that the government can invoke its evidentiary privileges only at the price of letting the defendant go free." 345 U.S. at 12, 73 S.Ct. 534.

To the extent that *Reynolds* and *Andolscheck* were considered applicable by the Court of Appeals in *Irish People, Inc.,* they were taken as standing for "the proposition that courts must balance a number of factors in determining how to proceed when one side or the other has claimed that certain evidence is privileged." 684 F.2d at 950. After balancing the defendants' need for the documents against the governmental interest at stake, the court found that the exercise of the privilege did not, in that case, warrant dismissal of the claim against the defendant.

By applying a balancing test, the Court adhered to its disapproval of the "automatic waiver theory" of *Independant Productions Corp. v. Loew's, Inc.,* which it had previously expressly rejected in *Black Panther Party v. Smith,* 661 F.2d 1243, 1267 (D.C.Cir.1981). In light of the thorough and persuasive analysis by the D.C. Court of Appeals, and in the absence of any approval of *Independant Productions Corp.* by the Second Circuit Court of Appeals, this court declines to hold that the state is constitutionally forbidden to promulgate or exercise a privilege in a noncriminal, administrative action it has commenced.

On the other hand, it is equally unwarranted to dismiss plaintiffs' claim, as defendants urge the court to do, merely by invoking the principle of *Arnett v. Kenne-*

*dy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974), that a plaintiff "must take the bitter with the sweet," i.e., that Council 82's right to dues check-off is "inextricably intertwined with the procedures which are to be employed in determining that right." *Id.* at 153–54, 94 S.Ct. at 1643–44. As the Supreme Court subsequently acknowledged in *Vitek v. Jones,* 445 U.S. 480, 490, n. 6, 100 S.Ct. 1254, 1262, n. 6, 63 L.Ed.2d 552 (1980), an unacceptable implication of *Arnett* would be that "whatever the nature of an individual's statutorily created property interest, deprivation could be accomplished without notice or hearing at any time" if the interest was conferred subject to that proviso. *Quoting Arnett v. Kennedy, supra* 416 U.S. at 166–67, 94 S.Ct. at 1650 (opinion of Powell, J.).

Thus, this court will neither automatically reject or automatically approve the privilege of CSL § 205.4(b) as the respective parties urge it to do, but rather, will "balance the legitimate interests of both parties." *Irish People, Inc.; supra,* 684 F.2d at 953 n. 44. More particularly, the court will determine the constitutionality of the statutory privilege in light of the familiar criteria identified by the Supreme Court in *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976):

> First, the private interest that will be effected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards, finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Clearly, the private interest at stake is substantial. Council 82 has alleged that the suspension of dues check-off privileges will greatly deplete its resources and threaten its very existence. The truth of that allegation must, on this motion, be assumed. However, the danger of insolvency is mitigated, if not eliminated, by the protection afforded Council 82 under N.Y.

CSL § 210.3(f), which requires the PERB Board to consider the financial resources of an employee organization in formulating a penalty, and, in the event the union's resources become exhausted, to resume dues deductions to the extent necessary to pay the balance of any fine.

With respect to the second *Mathews* factor, the risk of an erroneous deprivation, it should first be acknowledged that every privilege engenders some risk of an erroneous decision because, as mentioned previously, privileges "are in derogation of the search for truth." However, in the court's view, the increased risk in this instance is not substantial. Council 82 sought to elicit testimony from mediators for two purposes, the first of which was to prove that there had not been a meeting of minds in April of 1979. It is evident from the Hearing Officer's report that, while Council 82 may not have been able to interrogate every witness to the negotiations, it was nevertheless able to produce crucial fact witnesses on its behalf, and cross-examine crucial fact witnesses testifying against it. Under the circumstances it cannot be said that Hearing Officer Miller was apt to arrive at an erroneous decision because of the absence of further witnesses or that Council 82 was deprived of a meaningful opportunity to be heard on the issue.

Plaintiffs also sought to question witnesses concerning communications with PERB Board members, to establish their contention that the PERB Board was biased and would prejudge the case against them. This court has, however, determined as a matter of law in Part I–A, B, *supra,* that the pre-hearing familiarity with, and participation in, the negotiations by PERB Board members did not give rise to a sufficient danger of prejudgment to require disqualification. It follows, then, that the exclusion of testimony on this issue did not engender a constitutionally cognizable risk of erroneous deprivation.

Turning to the third *Mathews* factor, the government's interest in the procedural requirement, the court discerns a strong interest indeed. As discussed previously, the

exclusion of testimony by officials of an agency charged with assisting in the resolution of labor disputes will, in the judgment of the legislature, promote the overriding public interest in the peaceful, negotiated resolution of such disputes.

Viewing these factors collectively, the court concludes that N.Y. CSL § 205(4)(b) comports with due process, both on its face and as allegedly applied to Council 82. The third claim for relief is dismissed.

## IV.

Plaintiffs' fourth claim challenges the constitutionality of that portion of the penalty imposed by the PERB Board which provides:

> no dues or agency shop fees shall be deducted on [Council 82's] behalf until it affirms that it no longer asserts the right to strike against any government, as required by the provisions of CSL § 210.3(g).

*Amended Complaint* Appendix 6 at 10. Plaintiffs regard this condition on the restoration of dues check-off rights as "an unlawful infringement on the right of Council 82 to free speech under the First Amendment...." *Amended Complaint* ¶ 110. Plaintiffs' allegations fail to state a claim.

In imposing the above-quoted penalty, the PERB Board noted its reliance on N.Y. CSL § 210.3(g), which requires that an employee organization whose dues deduction rights have been ordered forfeited "may be granted such rights after the termination of such forfeiture only after complying with the provisions of [CSL § 207.3(b)]." That latter section empowers the PERB Board to:

> certify or recognize an employee organization upon ... (b) the affirmation by such organization that it does not assert the right to strike against any government, to assist or participate in any such strike, or to impose an obligation to conduct, assist, or participate in such a strike.

A First Amendment challenge to the affirmation requirement of CSL § 207.3(b) was squarely rejected in *Rogoff v. Anderson*, 34 A.D.2d 154, 310 N.Y.S.2d 174 (1st Dept.1970), *aff'd.*, 28 N.Y.2d 880, 322 N.Y.S.2d 718, 271 N.E.2d 553 (1971); *app. dsmsd. for want of a substantial federal question*, 404 U.S. 805, 92 S.Ct. 108, 30 L.Ed.2d 37 (1971). As presiding Justice Steven's viewed it, the question presented in *Rogoff* was

> whether the public employer may reasonably require the employee organization to state as true, or to declare or maintain (Black's Law Dictionary, 4th ed.) that it has no right to do that which is declared illegal or prohibited by law, i.e., strike or assist in a strike against the public employer. *Id.* 34 A.D.2d at 157, 310 N.Y.S.2d 174.

The court then reasoned:

> The whole scheme of the statute is for the protection of the public, assuring the orderly operation of the functions of government and the development of harmonious relations between public employer and employee. Certainly the condition imposed is reasonable for the benefits conferred, and is reasonably calculated to achieve the ultimate desired end. We do not so construe the requirement of the Statute and the Rule under attack as to conclude that they infringe upon the exercise of rights protected by the First Amendment. Nor is that "chilling effect" on free expression so evident as to warrant their rejection as unconstitutional. We find and declare that subdivision (3)(b) of Section 207, Civil Rights Law, is constitutional. *Id.* at 158, 310 N.Y.S.2d 174.

While it is true, as plaintiffs point out, that *Rogoff* only upheld the requirement that a union disaffirm the right to strike in order to *become certified*, CSL § 207.3(b), and did not address the requirement that a union disaffirm the right to strike in order to regain benefits forfeited on account of previous participation in an illegal strike, CSL § 210.3(g), this, in the court's view, is a distinction without a difference. To the extent that Council 82 has any greater rights by virtue of its certification, those rights were created subject to the reasonable requirement of CSL § 210.3(g), and remain subject to it.

In sum, because *Rogoff* is directly in point, and its underlying rationale is both convincing and fully applicable to the instant circumstances, plaintiffs' fourth claim for relief is dismissed.

### V.

Plaintiffs maintain in their fifth through eighth claims for relief that the imposition of a penalty on Council 82 violates the due process and equal protection rights of union members who joined Council 82 after the 1979 strike. This claim, too, is unpersuasive.

The penalties at issue here were imposed pursuant to CSL § 210.3(a) which provides:

> An employee organization which is determined by the board to have violated the provisions of § 210.1 shall, in accordance with the provisions of this section, lose the rights granted pursuant to § 208.-1(b).

Section 208.1(b) confers upon a duly certified and recognized employee organization the right to "membership dues deduction."

In this instance, the PERB Board made the determination that the *union* had violated the provisions of § 210.1, and accordingly penalized the *union* pursuant to § 210.3(a) by suspending its right to dues deductions.[18]

Obviously, a legal sanction imposed against a union, like one imposed against any corporate or collective entity, will adversely affect all of its members, including those individuals who were not members at the time the sanctioned misconduct occurred. Nevertheless, the Supreme Court has repeatedly held that a union may be

---

**18.** Penalties were also imposed upon individual members of Council 82 for their participation in the 1979 strike. The imposition of individual penalties was upheld against a constitutional challenge in *Cheeseman v. Carey*, 623 F.2d 1387 (2d Cir.1980).

treated as a single entity for liability purposes. *See United Mine Workers v. Coronado Coal Co.,* 259 U.S. 344, 42 S.Ct. 570, 66 L.Ed. 975 (1922); *Atkinson v. Sinclair Refining Co.,* 370 U.S. 238, 82 S.Ct. 1318, 8 L.Ed.2d 462 (1962).

█ But assuming, *arguendo,* that individual members of Council 82 have some protectable interest in Council 82's right to dues deduction, and that such interest would be impaired by the implementation of this penalty, they nevertheless fail to state a claim that any due process or equal protection rights are infringed. Plaintiffs are challenging the *substance,* and not the attendant procedures, of a statute that affects *economic,* and not fundamental rights. Therefore, their due process and equal protection rights are satisfied so long as the measure, and the classification embodied in the measure, bear a rational relation to a legitimate state purpose. *See Exxon Corp. v. Governor of Maryland, supra,* 437 U.S. at 124–25, 98 S.Ct. at 2213 (substantive due process challenge rejected because statute "bears a rationale relation to the State's legitimate purpose"); *Educ. Assn. v. Perry Local Educators' Assn.,* 460 U.S. 37, 55, 103 S.Ct. 948, 960, 74 L.Ed.2d 794 (1983) (equal protection challenge to classification that does not affect fundamental rights rejected because classification "rationally further[s] a legitimate state purpose.").

Clearly, the imposition of penalties against the union *qua* union is rationally related to the legitimate state purpose set forth in the first section of the Taylor Law:

to promote harmonious relationships between government and its employees and to protect the public by assuring, at all times, the orderly and uninterrupted operations and functions of government.

CSL § 200. Accordingly, plaintiffs' fifth through eighth claims are dismissed.

## VI.

█ Defendants request that, in the event the *Amended Complaint* is not dismissed in its entirety against all defendants, it at least be dismissed in its entirety against defendants Governor Carey, Director of the New York State Office of Employer Relations Meyer Frucher, and New York State Comptroller Edward V. Regan. That request is granted.

Plaintiffs bring this action pursuant to 42 U.S.C. § 1983, which authorizes the imposition of liability against an individual "only for conduct which 'subjects, or caused to be subjected' the complainant to a deprivation of a right secured by the Constitution...." *Rizzo v. Goode,* 423 U.S. 362, 370–71, 96 S.Ct. 598, 603–04, 46 L.Ed.2d 561 (1976). *See Duchesne v. Sugarman,* 566 F.2d 817, 831 (2d Cir.1977). It is unnecessary to search the entire *Amended Complaint* for allegations which might support a claim against defendants Carey, Frucher, or Regan. As the court now holds, plaintiffs' only viable claim is the First Claim for Relief insofar as it is based on allegations (1) that PERB Board members were rendered impartial by verbal abuse directed toward them, Part I–C, *supra;* (2) that an impermissible *ex parte* contact occurred during the adjudicatory proceedings. Part I–D, *supra;* and (3) that public statements were made by PERB Chairman Newman which are indicative of prejudgment or a constitutionally intolerable appearance of prejudgment. Defendants Carey, Frucher, and Regan are unconnected with any of these allegations, thus no § 1983 claim is stated against them. Moreover, the court notes that should plaintiffs prevail on their First Claim for Relief, complete relief can be fashioned by a court order directed toward the remaining defendants.

## VII.

For the reasons set forth above, defendants' motion, pursuant to Rule 12(b)(6), Federal Rules of Civil Procedure, to dismiss the Amended Complaint for failure to state a claim upon which relief can be granted is:

DENIED with respect to the First Claim for Relief, but only insofar as such claim is based on allegations (1) that PERB Board members were rendered impartial by ver-

bal abuse directed toward them; (2) that PERB Board members discussed with Jerome Lefkowitz and Martin Barr the merits of a pending case brought by PERB against Council 82; (3) that public statements were made by PERB Chairman Newman that are indicative of prejudgment or a constitutionally intolerable appearance of prejudgment; and is

GRANTED with respect to the Second through Eighth Claims for Relief; and is

GRANTED with respect to defendants Carey, Frucher, and Regan.

IT IS SO ORDERED.